IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| THOMAS CHARLES FORSYTHE, | ) |
| Plaintiff, | ) |
| v. | ) No.: 3:18-cv-122 |
| | ) JURY DEMAND |
| NATIONAL HEALTH CORPORATION, | ) |
| Defendant. | ) |

## AMENDED AND RESTATED COMPLAINT

COMES NOW the Plaintiff, Thomas Charles Forsythe, by and through counsel, and pursuant to the Court's Order entered on March 22, 2018, files this Amended and Restated Complaint, and sues the Defendant, and for cause of action would show unto this Honorable Court as follows:

1. Plaintiff is a citizen and resident of Knoxville, Knox County, Tennessee.

2. Defendant, National Health Corporation, is a corporation operating in the State of Tennessee, with its principal place of business located at 100 East Vine Street, Ste. 1400, Murfreesboro, Tennessee 37130, and may be served with process through its registered agent, National Registered Agents, Inc., at 800 South Gay Street, Ste. 2021, Knoxville, Tennessee 37929.

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because it involves a claim arising under Federal law, to-wit: 31 U.S.C. § 3730(h), *et seq*. Venue is proper under the code provisions of 28 U.S.C. § 1391(b) and (c).

4. The Defendant is an employer engaging in an industry affecting commerce.

5. The Defendant is an employer subject to the provisions of 31 U.S.C. § 3730(h).

6. The Defendant is an employer subject to the provisions of T.C.A. § 50-1-304.

7. During all times set forth herein, Defendant was a participant in the Medicare program, and it billed Medicare, and it received monies from Medicare.

8. The Defendant operates a skilled nursing facility, licensed by the Tennessee Department of Health as a nursing home on Highlands Avenue in Knoxville, Knox County, Tennessee, and it is also an assisted living facility licensed by the Tennessee Department of Health.

9. Plaintiff, Thomas Charles Forsythe, was hired by the Defendant as a Physical Therapist Assistant on or about September 29, 1997, to work at National Health Corporation/Fort Sanders.

10. Thomas Charles Forsythe is licensed by the State of Tennessee, Department of Health as a Physical Therapist Assistant, License Number 2628, originally granted October 8, 1997.

11. During his employment, the Plaintiff worked for Defendant primarily at its facility located at 2120 Highland Avenue, Knoxville, Knox County, Tennessee.

12. Defendant's facility located at 2120 Highland Avenue, Knoxville, Knox County, Tennessee 37916-1112, is a Tennessee licensed Skilled Nursing Facility, License No. 445107. It is also licensed by The United States Department of Health and Human Services, License No. 00000319.

13. In July, 2010, the Plaintiff attended a "compliance training" program at the Knoxville facility conducted by Edwin Lopez, Regional Rehabilitation Manager, and Suzanne

2

Lawrence, Assistant Regional Rehab Manager. This compliance training was held at the Fort Sanders location and was attended by physical therapists, occupational therapists, and speech therapists and the assistant therapists, including the Plaintiff. During this training, they were instructed that due to a "change in the regulations," beginning October 1, 2010, they needed to start using the group code 97150 for group sessions instead of the one-on-one codes that they had been using, to-wit: codes 97110, 97116 or 97530.

14. During the "compliance training", the employees were informed that beginning October 1, 2010, the therapists and the therapist assistants would need to change the way they had been coding in order to comply with new Medicare regulations. They were instructed that they could no longer code Medicare in the manner they had been coding when they treated two or more patients at the same time. Previously, when they treated two or more patients simultaneously, Defendant would code as if the therapists were seeing the patients one at a time, using CPT codes 97110, 97116, 97530, instead of coding using a group code. They were instructed that after October 1, 2010, if they saw patients in a group, they would need to use the group code. During this training session, they received a document from the Regional Rehabilitation Manager, Edwin Lopez, which explained how to comply with the new policies and procedures after October 1, 2010. During this meeting, Regional Rehabilitation Manager, Edwin Lopez, and Suzanne Lawrence, Assistant Regional Rehabilitation Manager, explained that the "new" policies and procedures were to go into effect on October 1, 2010, but they were instructed to implement the policies and procedures on August 1, 2010, so they would have two months of practice before the change actually went into effect.

15. On August 1, 2010, the Plaintiff had a conversation with his Supervisor, David

3

Grantham, about the implementation of the new coding procedures, and he told the Plaintiff that they were not going to do anything different, but to continue coding in the way they had been coding. When September 1, 2010 came, the Plaintiff asked Mr. Grantham again when they were going to implement the new way of coding, and again, he stated that nothing would change, that they would continue to code as in the old manner and "no one would know the difference".

16. When October 1, 2010 came, the Plaintiff believed, at that time, that it was mandatory to implement the new coding changes, and he again had a discussion with his supervisor, Grantham, who stated "as long as no one from management was present watching" that they were to "continue coding the old way" using the individual codes instead of the group code, and no one would know any different.

17. In November 2010, two Regional Managers came to the Highland's facility, Edwin Lopez and Suzanne Lawrence, and they had another discussion with the therapists and the therapist assistants, and stated that they had a report that their location was not in compliance with the new Medicare coding regulations, and if they were not in compliance, then they were actually committing "Medicare fraud."

18. When Edwin Lopez, Regional Rehabilitation Manager and Suzanne Lawrence, Assistant Regional Rehabilitation Manager, were present at the facility in late-November, 2010 observing, Mr. Grantham told the therapists and the therapist assistants to make sure they were complying with the new regulations, because the regional staff was observing what they were doing.

19. Edwin Lopez, Regional Rehabilitation Manager, and Suzanne Lawrence, Assistant Regional Rehabilitation Manager, stopped observing after the therapists and the

4

assistant therapists came back from lunch, and contrary to the new regulations, the Plaintiff's supervisor, David Grantham, instructed the therapists and therapist assistants to go back to the old way of coding, because the regional staff were not present, and he told them: "Without anyone actually observing, we should continue coding and treating patients as we have done previously."

20. The Plaintiff refused to go along with these instructions, and he complied with his understanding of the new regulations and coded appropriately, using the group code number 97150 for group therapy sessions because he did not want to commit Medicare fraud.

21. Shortly after Edwin Lopez, Regional Rehab Manager, and Suzanne Lawrence, Assistant Rehabilitation Manager, came in late-November, 2010, David Grantham called the Plaintiff and Tonya Bradford, Physical Therapist, into his office and instructed them to go back to the old way of coding. Plaintiff told Mr. Grantham that he could not afford to lose his license and he was not going to do anything to jeopardize that by committing Medicare fraud.

22. Thereafter, on November 28, 2010, the Plaintiff called the Defendant's hot line, Value Line, and made an anonymous complaint that his Supervisor, David Grantham, was committing Medicare fraud, and that Grantham was instructing his staff to commit Medicare fraud.

23. The Plaintiff called the hot line back at the end of another ten to fourteen days to see if the company had a response to his complaint, and at that time, he was told that the "investigation wasn't complete".

24. As a result of his compliance with the new regulations, the Plaintiff's productivity went down significantly. However, the therapists and therapist assistants had been instructed

5

during the training session that Defendant expected productivity would go down due to this new manner of coding. If coding properly, then they would not be able to see the same amount of patients in an eight hour shift, and Medicare revenue would decrease, and this was one of the reasons that Grantham was upset about the new way of coding: productivity and revenue would go down. Plaintiff would see an average of 12 to 14 patients per day before the new regulations, but after the new regulations and way of coding, he could see only 6 to 7 patients a day or about fifty percent (50%) of what he had been seeing before.

25. Mr. Grantham's fraudulent instructions to the therapists and the assistant therapists allowed the therapists and assistant therapists to see more patients in shorter time periods, but to code as if they were seeing them separately, and code them as if they were provided higher levels of therapy, and thereafter make false time entries to cover it up, all of which were fraudulent.

26. On and after October 1, 2010, Mr. Grantham instructed the therapy staff to ignore the new regulations because they really needed to increase their productivity and provide the numbers that management wanted from them.

27. On January 7, 2011, Mr. Grantham again told the Plaintiff that he needed to revert back to the old way of coding, and the Plaintiff refused because it would be Medicare fraud, and Mr. Grantham told him that Mr. Ford, the Administrator, had been breathing down his neck about numbers and productivity and revenue, and he said, "S_ _ _ rolls down hill and I'm putting it on you". He told Plaintiff that he did not feel like the Plaintiff was pulling his fair share of the weight, and he was not working as diligently as he should, and he wanted to know what he was going to do about it. In this meeting, Mr. Grantham stated: "I know over the last month of

6

December you have been following the Medicare rules by the rule book. You've been going by the book and following the rules verbatim and you cannot do that. I want you to go back to doing it the way we always have. Unless somebody is actually here witnessing what we are doing, nobody would know the difference". Mr. Grantham also stated, "Well, don't tell Edwin Lopez what I said".

28. On or about January 11 or 12, 2011, Plaintiff spoke to Suzanne Lawrence, one of the Regional Rehabilitation Managers, and he asked to be transferred to another facility. She asked, "Why?", and the Plaintiff again complained about what had been taking place with respect to Mr. Grantham and his instructions to commit Medicare fraud. At that point, Ms. Lawrence called another female employee, LeAnn Duckett, in to witness the conversation, and thereafter, Ms. Lawrence told the Plaintiff that she would have to speak to Edwin Lopez, Regional Rehabilitation Manager, the following day.

29. On or about January 12 or 13, 2011, the Plaintiff went over the same information with Mr. Lopez that he had conveyed to Suzanne Lawrence about the supervisor's instructions, and Mr. Lopez indicated to the Plaintiff that he was going to pass it on to his supervisor.

30. On January 14, 2011, the Administrator of the building, Doug Ford, called the Plaintiff to come upstairs to speak with him. The Plaintiff was aware that the Administrator, Doug Ford and David Grantham were very good friends. The Plaintiff did not want to talk to Doug Ford by himself, so he asked Suzanne Lawrence to go with him as a witness when he went to see Doug Ford.

31. When the Plaintiff and Suzanne Lawrence arrived at Mr. Ford's office, Ford's first comment was: "Tom, I see you brought your muscle with you". Mr. Ford proceeded to tell

the Plaintiff that he had spoken with David Grantham, and David Grantham would "never" have told the Plaintiff "to do anything that was wrong". Mr. Ford stated that he had reviewed the paperwork and billing information from their department, and there was no evidence of Medicare fraud. Mr. Ford stated the Plaintiff had misunderstood what David Grantham had instructed him to do. The Plaintiff told Mr. Ford that he did not want to have a conversation with him unless Edwin Lopez was present, and Mr. Ford replied: "Well, I was hoping to get this resolved today". Mr. Ford told the Plaintiff that the Plaintiff's previous experience in law enforcement had given him a different perspective on things, at which time, the Plaintiff indicated that because of his prior experience in law enforcement, he had documented everything that had transpired since July of last year.

32. Mr. Ford indicated that David Grantham was a good friend of his, and there was no way he had done anything wrong, and he informed the Plaintiff: "I take care of my department heads".

33. On or about January 17, 2011, Mr. Edwin Lopez told the Plaintiff that he was being reassigned to a different facility in Farragut, pending an investigation.

34. On or about January 19, 2011, Mr. Lopez and the Regional Vice President of the company, Ray Blevins, met with the Plaintiff and told him that he would be going back to his old facility at NHC Fort Sanders. The Plaintiff told them that he did not want to work under David Grantham because of the complaints that he had made, and they indicated to him that it would not be a problem. The Plaintiff later learned that Mr. Grantham had resigned on or about January 28, 2011. Regional Vice President, Ray Blevins, made it seem like the Plaintiff had caused a burden, kind of stirred up a hornet's nest, and it had cost them a Physical Therapist.

8

35. On February 4, 2011, Edwin Lopez told the Plaintiff that "NHC would self-report to Medicare about this compliance issue and make a refund to Medicare".

36. After February 4, 2011, Defendant did self-report this issue, after which, it did make a refund to Medicare.

37. After the Plaintiff returned to the facility in February of 2011, he began to be treated in a hostile and cold manner. He was referred to as a "snitch" by a co-worker, his work schedule was abruptly changed, he was denied requests for time off for doctor's appointments, and also denied time off for continuing education courses, and he was given the cold shoulder.

38. The Plaintiff received a disciplinary action on or about February 28, 2011 because he failed to perform therapy on a patient who refused therapy and Defendant missed having the patient placed in the highest RUG, and therefore, did not get the maximum per diem payment from Medicare. The disciplinary action was not called for because there was nothing Plaintiff could have done when this patient refused therapy, other than to submit a record indicating he performed therapy when he had not.

39. Thereafter, the Plaintiff was fired by Defendant on March 7, 2011, for allegedly "creating a hostile environment", but this was a trumped up excuse.

40. The reason given for Plaintiff's termination was a pretext, and the real reason Plaintiff was fired was in retaliation for objecting to, and trying to prevent, Defendant from engaging in Medicare fraud, and for blowing the whistle on Defendant's fraudulent practices.

41. The Plaintiff was fired in retaliation for his oppositional activities, because he complained about and/or tried to stop Medicare fraud, and opposed Defendant's fraudulent practices, and/or retaliated against him for his refusal to violate the law, and/or for blowing the

whistle on Defendant's illegal activities, in violation of 31 U.S.C. 3730(h) and Tenn. Code Ann. § 50-1-304.

42. As a result of the aforesaid, the Plaintiff, Thomas Charles Forsythe, was wrongfully fired, and he sues the Defendant, National Health Corporation, pursuant to 31 U.S.C. § 3730(h), Tennessee Common Law for termination in violation of Public Policy, and pursuant to Tennessee Code Annotated § 50-1-304.

43. The Defendant is responsible for the discriminatory and retaliatory actions of its agents and employees under the doctrine of respondent superior and under other agency principles.

44. As a proximate result of Defendant's conduct, Plaintiff incurred a loss of income and benefits, both past and future, other pecuniary losses, and he sustained and continues to sustain substantial emotional distress, humiliation, and embarrassment.

45. The Defendant's conduct was intentional, malicious, fraudulent, and/or reckless sufficient to justify the imposition of significant punitive damages.

WHEREFORE, Plaintiff prays for the following relief:

1. Compensatory damages, including back pay and front pay, (or, in the alternative, reinstatement if the Court deems it appropriate);

2. Two times the amount of back pay;

3. Punitive damages;

4. Prejudgment interest;

5. Reasonable attorney's fees;

6. Costs of this action;

7. A jury to try this cause; and

8. Appropriate injunctive relief ordering Defendant to cease and desist from engaging in illegal retaliatory acts and undergo such training in illegal retaliation, as is appropriate.

RESPECTFULLY SUBMITTED this the 5th day of April, 2018.

**THE BURKHALTER LAW FIRM, P.C.**

s/David A. Burkhalter, II
David A. Burkhalter, II, BPR #004771
D. Alexander Burkhalter, III, BPR #033642
Attorneys for Plaintiff
P.O. Box 2777
Knoxville, Tennessee 37901
(865) 524-4974

11